FILED

2011 Aug-26  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **DONALD ALBRETS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:11-cv-00869-AKK** |
| **SITEL OPERATING** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The court has for consideration Donald Albrets's ("plaintiff" or "Albrets")

Motion for Conditional Class Certification and To Facilitate Court-Approved

Notice Under § 216(b) of the Fair Labor Standards Act, filed on April 26, 2011.

Doc. 12.  The motion is fully briefed, docs. 21 and 28, and is under submission.  In

its discretion, and, after considering the parties' submissions and as stated more

fully below, the court **GRANTS** plaintiff's motion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Sitel Operating Corporation ("defendant") operates call center facilities,

providing outsourced customer contact services for various clients.  Doc. 16 ¶¶ 3-

4.  At one time, defendant operated four call centers in Alabama: in Birmingham,

Winfield, Hamilton, and Andalusia.  Doc. 22-1, Hain dec. ¶ 3.  Only the Hamilton

and Andalusia call centers remain open.[1]  Doc. 22-1, Hain dec. ¶ 4.  Plaintiff

worked at defendant's Birmingham call center from May 1999 to August 2010 as

a Customer Service Representative ("CSR").  Doc. 16 ¶¶ 6, 10; Doc. 14-1, Albrets

dec. ¶¶ 2-3.  As a CSR, plaintiff's duties consisted of assisting customers of a

wireless telecommunications company with questions about billing, price plans,

technical support and other issues.[2]  Doc. 16 ¶ 7.  Over the past three years,

defendant has employed over 3,000 CSRs at its four Alabama call centers.  Doc.

16 ¶ 31; Doc. 21, at p. 2.

On March 3, 2011, plaintiff filed the current action pursuant to the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, alleging that defendant

intentionally failed to pay him and other similarly situated CSRs overtime

compensation and asserting a collective action pursuant to section 216(b) of the

FLSA.[3]  Doc. 1 ¶ 1.  Plaintiff seeks unpaid overtime compensation plus an

additional amount as liquidated damages, judgment, attorneys' fees, costs,

---

[1]Defendant's Winfield and Birmingham call centers closed in February 2010 and September 2010, respectively.  Doc. 22-1, Hain dec. ¶ 4.

[2]Defendant contends that plaintiff was not actually a CSR for his entire employment and that from December 2006 to November 2008, plaintiff's job title was actually "Quality Analyst," a role in which he listened to, and evaluated other employees' phone calls.  Doc. 22-1, Hain dec. ¶ 12.

[3]Plaintiff's original complaint named Sitel Corporation as defendant.  *See* Doc. 1. Subsequently, plaintiff filed an amended complaint to properly identify defendant as Sitel Operating Corporation.  *See* Doc. 16.

disbursements, and interest.  Doc. 16, at p. 8.

On April 26, 2011, forty-two former employees of defendant filed consents to sue with this court (hereinafter "potential opt-in plaintiffs").  Doc. 11.  On the same day, plaintiff filed the instant motion for certification of a conditional class and to facilitate notice, supported by his own declaration as well as the declarations of seventeen of the potential opt-in plaintiffs.  Docs. 12 and 14.  Plaintiff also submitted a proposed notice form to potential class members, which clarified that plaintiff seeks to certify an opt-in class of plaintiffs defined as follows:

> All present and former hourly paid employees of
> Defendant Sitel Operating Corporation's Alabama
> facilities, who performed overtime work, off the clock,
> pre-shift and/or post-shift in one or more weeks from
> March 3, 2008, to the present.

Doc. 12-1.  On May 25, 2011, seven additional potential opt-in plaintiffs filed consents to sue.  Doc. 20.  Defendant filed its response in opposition to plaintiff's motion on May 31, 2011, arguing that conditional class certification and notice is inappropriate because plaintiff and his proposed opt-in class are not "similarly situated" to each other within the meaning of 29 U.S.C. § 216(b).  Doc. 21.  On June 20, 2011, plaintiff filed his reply along with a supplemental declaration and nine additional declarations from potential opt-in plaintiffs.  Docs. 28 and 29.  On

June 24, 2011, this court granted plaintiff leave to file the declaration of Faith

Wilkerson, a potential opt-in plaintiff who is currently employed as a CSR at

defendant's Andalusia call center.  Doc. 30.  Seven more potential opt-in

plaintiffs, including Wilkerson, have since filed consents to sue.  Docs. 26 and 31-

34.  In sum, fifty-six potential plaintiffs have already opted-in to plaintiff's

lawsuit, and twenty-eight of those individuals have submitted declarations in

support of plaintiff's claims.  All of the potential opt-in plaintiffs are former CSRs

at defendant's Birmingham call center, with the exception of Wilkerson, who is

currently employed by defendant in Andalusia.  Doc. 30 ¶ 4.

## II.  DISCUSSION

### A.  Legal Framework for Conditional Class Certification and Notice

Section 216(b) of the FLSA authorizes actions for unpaid overtime

compensation against an employer "by any one or more employees for and in

behalf of himself or themselves and other employees similarly situated."  29

U.S.C. § 216(b).  Thus, to maintain a collective action under the FLSA, plaintiffs

must demonstrate that they are "similarly situated."  *Morgan v. Family Dollar

Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008).  Further, would-be plaintiffs in

a section 216(b) collective action must affirmatively "opt-in" to the suit.[4]  29

U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless

he gives his consent in writing to become such a party and such consent is filed in

the court in which such action is brought.").  "That is, once a plaintiff files a

complaint against an employer, any other similarly situated employees who wants

to join must affirmatively consent to be a party and file written consent with the

court." *Morgan*, 551 F.3d at 1259.  The FLSA does not provide specific

procedures by which potential plaintiffs may opt-in, but the Supreme Court has

held that "district courts have discretion, in appropriate cases, to implement 29

U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs." *Hoffman-La

Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).  *See also Haynes v. Singer Co.*,

696 F.2d 884, 886 (11th Cir. 1983).  Indeed, the Supreme Court has endorsed the

practical benefits of FLSA collective actions, as follows:

> A collective action allows . . . plaintiffs the advantage of
> lower individual costs to vindicate rights by the pooling
> of resources.  The judicial system benefits by efficient
> resolution in one proceeding of common issues of law
> and fact arising from the same alleged discriminatory
> activity.  These benefits, however, depend on employees
> receiving accurate and timely notice concerning the

---

[4]In this way, section 216(b) collective actions differ from Fed. R. Civ. P. 23 class actions because under Rule 23, a person must affirmatively "opt out" if he or she wishes to abstain from the lawsuit. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001).

> pendency of the collective action, so that they can make
> informed decisions about whether to participate.

*Hoffman-La Roche*, 493 U.S. at 170.

The Eleventh Circuit has suggested a two-tiered process for district courts

to manage collective actions. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208,

1218-19 (11th Cir. 2001).[5]  At the first stage, called conditional certification or the

"notice" stage, the district court makes a determination, based on the pleadings

and affidavits on file, of whether it should authorize notice of the action to

potential class members. *Id.* at 1218.  Because the court has minimal evidence, the

standard is lenient. *Id.*  The district court must merely be satisfied that there are

other employees who wish to opt-in, and that they are similarly situated to the

original plaintiff "with respect to their job requirements and with regard to their

pay provisions." *Morgan,* 551 F.3d at 1259 (quoting *Dybach v. Florida Dept. of

Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)).  Indeed, this inquiry

"typically results in 'conditional certification' of a representative class." *Hipp*,

252 F.3d at 1218.  If the court conditionally certifies a class, court-supervised

notice of the pendency of the action is then given to the potential class members,

---

[5]Although *Hipp* addresses a collective action brought under the Age Discrimination in
Employment Act, the same analysis applies to collective actions under the FLSA. *Cameron-
Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003).

6

and they are afforded an opportunity to opt-in to the action. *Id.*

The second stage of the process is activated by the defendant's filing of a decertification motion following the completion of discovery. *Id.* at 1218. At this stage, based on a fully-developed record, the court makes a determination of whether the named plaintiffs and the opt-ins are similarly situated. *Id.* The plaintiff has a heavier burden to show similarity at the second stage than at the first stage. *Morgan*, 551 F.3d at 1261. If the court finds the plaintiffs are not similarly situated, it decertifies the action, dismisses the opt-in plaintiffs without prejudice, and the named plaintiffs proceed to trial on their individual overtime claims. *Hipp*, 252 F.3d at 1218. At all times, the decision to create an opt-in class under section 216(b) "remains soundly within the discretion of the district court." *Id.* at 1219.

Presently, plaintiff is at the first step, seeking initial conditional certification of the class and judicial approval of a proposed notice to potential members. As such, plaintiff's burden at this stage hinges on his ability to show that he and the prospective opt-in plaintiffs are "similarly situated." *Morgan*, 551 F.3d at 1259 (citation omitted). The FLSA does not define "similarly situated," *see* 29 U.S.C. § 216(b), and while the Eleventh Circuit has refused to adopt a precise definition for the term, *see Morgan*, 551 F.3d at 1259, it has provided some guidance. It is clear

that to maintain an FLSA collective action, the named plaintiff or plaintiffs "need only show that their positions are similar, not identical, to the positions held by the putative class members." *Grayson v. K-Mart*, 79 F.3d 1086, 1096 (11th Cir. 1996). Yet, the "similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). "Otherwise, 'it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.'" *Id.* (citation omitted). Essentially, a plaintiff must demonstrate a "reasonable basis" for his claim of class-wide discrimination. *Grayson*, 79 F.3d at 1097. This burden, "which is not heavy,[6] [is met] by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Id*. (citation omitted). *See also Morgan*, 551 F.3d at 1261 ("The district court's broad discretion at the notice stage is thus constrained, to some extent, by the leniency of the standard for the exercise of that discretion. Nonetheless, there must be more than 'only counsel's unsupported

---

[6]Indeed, the Eleventh Circuit has also described plaintiff's burden of showing a similarly situated class at this initial stage of the litigation as "'not particularly stringent,' 'fairly lenient,' 'flexib[le],'. . . and 'less stringent than that for joinder under Rule 20(a) or for separate trials under 42(b).'" *Morgan*, 551 F.3d at 1260-61 (citations omitted).

assertions that FLSA violations [are] widespread and that additional plaintiffs would come from other stores.'") (citation omitted).

### B. Evaluation of Plaintiff's Motion for Conditional Class Certification

> *1.     Plaintiff's Showing of Others Similarly Situated*
> *and a Desire to Opt-In*

Plaintiff contends that conditional class certification is appropriate because he has established that there are other employees who desire to opt in and who are similarly situated with regard to the FLSA violation alleged in his complaint, i.e., that defendant has a policy and practice of failing to pay CSRs one and one-half times their regular rate of pay for all hours worked over forty in a work week.[7] Doc. 16 ¶¶ 25-26.  Plaintiff has submitted detailed allegations on this issue, and to date, has submitted twenty-eight declarations from prospective opt-in plaintiffs. Plaintiff's evidence generally shows the following:

Plaintiffs, whether named or opting-in, state that they are all current or former hourly paid, nonexempt employees of defendant.  Doc. 16 ¶ 8; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 4.  All worked for defendant as CSRs for at least one week during the last three years.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 2-4.  As CSRs, plaintiffs' job duties consisted of handling telephone calls

---

[7]The FLSA requires employers to provide overtime compensation to employees at a rate of one and one-half times their regular rate of compensation.  *See generally* 29 U.S.C. § 207.

from customers of defendant's clients.  Doc. 16 ¶¶ 7-9; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 3, 5.  All plaintiffs state that they frequently worked or work over forty hours in a given work week, yet were not paid one and one-half times their regular hourly rate for hours worked in excess of forty.  Doc. 16 ¶ 9; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 12-13.

More specifically, all plaintiffs state that defendant required them to perform tasks before they logged in to defendant's timekeeping system every morning, for which they received no compensation.  Doc. 16 ¶¶ 12-16; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 8-9.  These tasks included powering up their computers and entering their computer passwords, loading various required computer programs in order to begin work, reviewing their schedules for the day, and reviewing any memoranda or directives from defendant or its clients.  Doc. 16 ¶ 15; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 8-9.  Only after completing these tasks could they then press the "Available" button on the phone system, signifying their availability to take calls and which, in turn, started the recording of their time for compensation.  Doc. 16 ¶¶ 15, 17; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 8-9.  In order to accomplish these tasks before pressing the "Available" button, plaintiffs arrived at work anywhere from ten to fifteen minutes before their scheduled shift each day.  Doc. 16 ¶ 21; Docs. 14-1 to 14-18, 29-2 to

29-10, and 30-1, ¶¶ 6, 9.  However, defendant only paid them for the time they worked after they pressed the "Available" button on the phone system.  Doc. 16 ¶ 16; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 9.

Plaintiffs state also that the cycle reversed at the end of their shifts in that defendant required them to continue performing duties after they logged off the timekeeping system at the end of each work day.  Doc. 16 ¶ 23; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 10.  Specifically, at the end of their shifts, they depressed the "Available" button, deactivating it so that they ceased receiving calls.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 10.  Depressing the "Available" button also stopped the recording of their time, thus ending their paid time for the day.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 10.  However, although they were no longer on the time clock, all state that they still had to shut down all of the computer programs they used that day to perform their job duties, and then log out of the computer system, which took anywhere from five to fifteen minutes after they depressed the "Available" button.  Doc. 16 ¶ 23; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 10.

Due to this pre-shift and post-shift work, plaintiffs estimate that they worked an average of fifteen to thirty minutes per day without compensation.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 11.

Plaintiff alleges that CSRs at each of defendant's four Alabama call centers followed the same policies, practices and procedures, requiring them to work off the clock on a daily basis for defendant's benefit.  Doc. 16 ¶ 24.  The declarations provide evidentiary support for this contention, as most potential opt-in plaintiffs state that they complained to their supervisors about their unpaid work time. Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 14.  In response, their supervisors told them that defendant paid the CSRs only for their "Available" time, i.e., the time after they pressed the "Available" button and until the end of their scheduled shift, when they depressed the "Available" button, and that they were unable to do anything about getting them paid for the time before or after they stopped receiving calls.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 14.  The remaining potential opt-in plaintiffs state also that defendant told them this same information during training sessions.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 14.

Under a reasonable view of plaintiff's evidence, the court finds that he has sufficiently demonstrated that there are other CSRs employed by defendant who are similarly situated to him, insofar as they are all subject to defendant's unified practice of paying CSRs only for the time they were "Available" to take calls. Moreover, the declarations provide evidentiary support for the proposition that

12

CSRs typically begin work promptly after arriving at work, but are not paid until the start of their scheduled shift, and continue to work after the end of their scheduled shift, yet are also not paid for this time. *See Marsh v. Butler County Sch. Sys.*, 242 F. Supp. 2d 1086, 1093 (M.D. Ala. 2003) ("a plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions").

Further, plaintiff has shown that similarly situated employees wish to join the litigation through the filing of fifty-six consents to opt-in, even though the court has not approved or provided notice to the collective. *See e.g., Guerra v. Big Johnson Concrete Pumping, Inc.*, 2006 WL 2290512, at *4 (S.D. Fla. May 17, 2006) (an affidavit from one other co-worker demonstrated the existence of desire to opt-in and the more affidavits there are the more indicative the evidence is); *Pendlebury v. Starbucks Coffee Co.*, 2005 WL 84500, at *3 (S.D. Fla. Jan. 3, 2005) (conditionally certified nation-wide collective action based on two plaintiffs and declarations from four employees); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1316 (M.D. Ala. 2002) (three employees sufficient for state-wide certification).

### 2.   *Consideration of Defendant's Evidence to the Contrary*

To try to defeat conditional certification, defendant both criticizes plaintiff's evidence and offers extensive evidence to refute plaintiff's "similarly situated" allegations.  However, all of defendant's arguments lack merit, at least at this initial stage of the class certification proceedings.  Initially, defendant asserts that plaintiff's declarations do not identify a single illegal policy, plan or decision by defendant to violate the FLSA.  This assertion falls short because the Eleventh Circuit has twice confirmed that "a unified policy, plan or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)."  *Grayson*, 79 F.3d at 1095; *see also Hipp*, 252 F.3d at 1219.  Even so, the record in this case is sufficient to meet this standard.  More than two dozen declarants attest that 1) as trainees, their supervisors told them that defendant paid CSRs only for their "Available" time and that CSRs could do nothing to receive compensation for their pre-shift or post-shift work, or that 2) after the training period, their supervisors told them the same thing when they complained about the failure to pay them for their pre-shift or post-shift work.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 14.  Such testimony is evidence of

a uniform policy to undercount CSR's overtime hours.[8]

Defendant argues next that since there is no evidence of a common policy to violate the FLSA, which is incorrect and also not a necessary requirement, plaintiff must at least establish some "identifiable factual nexus which binds the named plaintiffs and potential class members together."  Doc. 21 at 17-18 (quoting *Harrison v. Enterprise Rent-A-Car*, 1998 U.S. Dist. LEXIS 13131, at *4 (M.D. Fla. July 1, 1998)).  To this end, defendant offers extensive evidence which it contends shows that plaintiff and the opt-ins are not similarly situated.

First, defendant contends that the nature of the work performed by the CSRs varied among its four Alabama locations.  However, to support this contention, defendant focuses on the type of clients served rather than the work performed. Specifically, defendant contends that the duties vary because CSRs in Birmingham and Winfield handled calls from customers of wireless telecommunications

---

[8]Defendant scorns the declarations for not describing the illegal policy in sufficient detail, such as explaining who made the policy known to the declarants and when, and why the declarants failed to report the illegal policy to management.  To the contrary, some potential opt-in plaintiffs do provide the name of the supervisor who told them about the policy.  See Doc. 29-4, Blaylock dec. ¶ 14; Doc. 29-5, Canady dec. ¶ 14.  In any event, defendant offers no precedential authority instructing that plaintiff must be so thorough with the evidence he presents at this initial stage of the proceedings, and the court can find none.  Rather, such facts will likely be borne out during discovery, and individual fact questions are more appropriately raised during the decertification stage, once the court has the benefit of a complete evidentiary record.  *See Goldman v. Radioshack Corp.*, 2003 WL 21250571, at *8 (E.D. Pa. April 16, 2003) ("A fact-specific inquiry is conducted only after discovery and a formal motion to decertify the class is brought by the defendant.").

companies, doc. 22-2, Williams dec. ¶ 11; doc. 22-3, Wilkerson dec. ¶ 13, in contrast to CSRs in Hamilton who communicated with customers of either 1) a telephone, internet and cable company or 2) a manufacturer of mosquito repellant devices, doc. 22-3, Wilkerson dec. ¶¶ 11-12, and CSRs in Andalusia who handled customer calls for numerous different clients, including a life insurance company, a mortgage company, a wireless telecommunications company, a credit reporting service, a power tools company, and a digital recording device client, doc. 22-4, Hall dec. ¶ 11.  Additionally, some Andalusia CSRs make calls related to various temporary projects that last only days or weeks at a time.  Doc. 22-4, Hall dec. ¶ 11.  Further, to service these various clients, defendant asserts that CSRs use client-specific software programs and files developed and maintained by each client, doc. 22-2, Williams dec. ¶ 11; doc. 22-3, Wilkerson dec. ¶ 12; doc. 22-4, Hall dec. ¶ 12, making CSRs not similarly situated.

Defendant's focus on the variety of its client base is misplaced.  The evidence before the court, including defendant's evidence, indicates that despite working on "campaigns" for various clients, CSRs in all four Alabama call centers performed essentially the same job, i.e., communicating with customers of defendant's clients over the telephone.  Moreover, defendant overlooks that all plaintiff must show at this stage is that members of the proposed class share

16

similar, not identical, positions.  *Grayson*, 79 F.3d at 1096.  Furthermore, the

particular job duties at issue here concern pre-shift and post-shift work, and have

nothing to do with whether a particular CSR is answering a call from a customer

of a wireless telecommunications company or a mosquito repellant manufacturer.

Indeed, regardless of the type of calls they answer, plaintiff and the opt-ins have

presented evidence that defendant required them to perform unpaid work before

and after their shifts ended.  Given this alleged common practice, defendant's

suggestion that plaintiff failed to show any similarity among putative class

members with regard to job duties simply ignores the overwhelming evidence that

says otherwise.

Second, defendant asserts that it uses different methods to record time.

According to defendant, during their training period, CSRs clocked in and out by

using an internet program called "Web Punch."  Doc. 22-2, Williams dec. ¶ 6;

Doc. 22-3, Wilkerson dec. ¶ 6; Doc. 22-4, Hall dec. ¶ 15.  However, once CSRs

actually begin working on campaigns on the production floor, i.e., fielding calls

from customers, they generally clocked in and out through their assigned

telephones, using a system called "Pay from the Switch."  Doc. 22-2, Williams

dec. ¶ 6; Doc. 22-3, Wilkerson dec. ¶ 12; Doc. 22-4, Hall dec. ¶ 14.  CSRs in the

Winfield, Hamilton and Andalusia call centers have used the Pay from the Switch

system since September 2006, and CSRs in Birmingham have used it since July 14, 2008.  Doc. 22-1, Hain dec. ¶¶ 7-8.  The only exception to these two systems is in Andalusia, where CSRs working on temporary campaigns record their time by hand.  Doc. 22-4, Hall dec. ¶ 14.

Rather than undermining plaintiff's case, this evidence actually supports plaintiff's assertion that CSRs are similarly situated because defendant acknowledges that, except when in training, CSRs at its four Alabama call centers generally used Pay from the Switch to log in and out via their assigned telephones during the relevant time period for notice, i.e., March 3, 2008 to March 3, 2011. Indeed, defendant admits that the named plaintiff, Albrets, used Pay from the Switch during his employment.  Doc. 22-1, Hain dec. ¶ 12; Davis dec. ¶¶ 5-6.  It is this policy that plaintiff and the opt-ins take issue with because they contend defendant failed to pay them for time worked prior to clocking in and after clocking out, due to defendant's policy of only paying them for their "Available" time.  Doc. 16 ¶¶  15, 17; Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶¶ 8-9.  To be clear, some individuals' experiences may ultimately prove to be dissimilar from those of the class, such as those employees who only worked in Birmingham prior to July 14, 2008, i.e., when defendant used a different system to record time, or those who worked solely on temporary campaigns in Andalusia and thus recorded

their time by hand.  However, the court concludes that plaintiff has advanced

sufficient evidence to meet his low burden with respect to the similarly situated

issue at this first stage of the litigation.  *See Longcrier v. HL-A Co., Inc*., 595 F.

Supp. 2d 1218, 1238 (S.D. Ala. 2008) (holding that it would be improper to make

fact-finding determination as to whether the putative plaintiffs are all subject to

the same policies, where pleadings and supporting declarations alleged facts

sufficient to satisfy conditional class certification inquiry); *Brown v. Money Tree

Mortgage, Inc.*, 222 F.R.D. 676, 682 (D. Kan. 2004) ("[T]he court will examine

the individual plaintiffs' disparate factual and employment settings, as well as the

various defenses available to the defendant which appear to be individual to each

plaintiff, during the 'second stage' analysis after the close of discovery.").

All of defendant's remaining arguments challenge the merits of plaintiff's

underlying claims of FLSA violations, as defendant presents evidence that it does,

in fact, pay CSRs for all time worked.  However, such arguments are premature at

this initial notice stage, where this court's only task is to determine if there are

similarly situated individuals who desire to opt-in.  *See Hoffman-La Roche*, 493

U.S. at 174 (cautioning that district courts, in exercising their discretion to

facilitate FLSA notice, "must take care to avoid even the appearance of judicial

endorsement of the merits of the action").  *See also Longcrier*, 595 F. Supp. 2d at

19

1241 ("To the extent that Defendant would now argue the merits of the case, such debates are premature and inappropriate.") (citing *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 893 (N.D. Iowa 2008) ("whether at the first or second step in the § 216(b) collective action certification process, plaintiffs need not prove the merits of their claim.  That is, plaintiffs do not have to show that the employer actually violated the FLSA."); *Lynch v. United States Auto Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007) ("a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated")).

Notwithstanding the overwhelming case law cautioning district courts from making merit determinations at the certification stage, defendant attacks the merits of plaintiff's contentions nonetheless.  Specifically, defendant explains that when a CSR uses the Pay from the Switch system to first clock in using his assigned phone, his phone automatically switches to an unavailable auxiliary mode so that the CSR cannot receive phone calls.  Doc. 22-1, Hain dec. ¶ 11.  According to defendant, the CSR is then required to perform preparatory activities while he or she is in auxiliary mode and while on the clock.  Doc. 22-1, Hain dec. ¶ 11.  When the CSR is ready to take a call, he or she then presses an "auto-in" button on the telephone that places the CSR in the queue to receive customer calls.  Doc. 22-1,

Hain dec. ¶ 11.  In fact, defendant asserts, a cursory review of Albrets's time records will show it paid him for time worked during which his assigned phone showed him as "unavailable," including several minutes at the beginning and end of each shift.  Doc. 22-1, Hain dec. ¶¶ 13-15.

The problem with defendant's explanation of how the Pay from the Switch system works is that it is contradicted by plaintiff's and the other twenty-eight declarations stating that defendant required CSRs to perform preparatory duties off the clock before they accessed the phone system.  Indeed, in response to defendant's evidence, Albrets has filed a supplemental declaration in further support of his motion, stating that CSRs had to have already booted up their computers before utilizing the "Available" button on the phone system.  Doc. 29-1, plaintiff supp. dec. ¶ 5 ("By the time we utilized the phone system available button, we had already booted up the computer.  While the phone system may go into a "idle" mode if we are not busy, we would be almost immediately contacted by a supervisor to be "available" on our phone system as quickly as possible, as Sitel kept very detailed statistics to report to their customers regarding the time we were on the clock to receive customer service related calls for that customer.").  Further, plaintiff reiterates in his supplemental declaration that in his practical experience working for defendant, CSRs regularly performed all preparatory

21

activities off the clock before pushing the "Available" button.  Doc. 29-1, plaintiff

supp. dec. ¶ 5.

Defendant would have the court weigh its claim that CSRs actually

performed preparatory activities while on the clock against the potential plaintiffs'

contrary testimony.  However, the court refuses to engage in a credibility

determination at this initial stage of the proceedings because doing so would

essentially result in it considering the merits of plaintiff's FLSA action.  *See Scott*

*v. Heartland Home Finance, Inc.*, 2006 WL 1209813, at *3 (N.D. Ga. May 3,

2006) ("Heartland challenges the statements of the declarants that they worked

more than 45 hours during a one-week period and were not paid minimum wage.

However, the Court declines to resolve factual issues or make credibility

determinations at this stage."); *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D.

516, 520 (D. Md. 2000) ("Factual disputes do not negate the appropriateness of

court facilitated notice.").[9]

Defendant also devotes numerous pages of its brief to arguing that its

---

[9]Even if the court were to examine Albrets's time records in an effort to make a
determination on the merits, which is an exercise properly left for trial, the court notes that
the fact that Albrets was shown to be in "unavailable" or "auxiliary" mode for several minutes on a
given day while he remained on the clock does not show that he did not also perform work prior
to clocking in and after clocking out.  Indeed, all of the declarants have testified that defendant
continued to pay them while they took breaks throughout the day.  *See* Doc. 16 ¶¶ 18-19, Docs.
14-1to 14-18, 29-2 to 29-10, and 30-1, ¶ 7.

written timekeeping policies and procedures comply with the FLSA.  More

specifically, defendant alleges that it provides all new employees with its

Associate Handbook and Timekeeping Policies, and reviews those with each new

employee.  Doc. 22-2, Williams dec. ¶ 16; Doc. 22-3, Wilkerson dec. ¶¶ 3-6.

These policies provide, among other things, that employees must clock in and

clock out within five minutes of their shift start and end times, employees cannot

work off the clock, and employees must immediately contact Human Resources if

they are asked to work off the clock.  Doc. 22-2, Williams dec. ¶ 3; Doc. 22-3,

Wilkerson dec. ¶ 3; Doc. 22-4, Hall dec. ¶ 3; Doc. 22-6 (Pay and Timekeeping

Policies from Associate Handbook); Doc. 22-7 (Timekeeping Policy).  Further,

part of defendant's training for each new employee includes instruction on how to

accurately record hours worked.  Doc. 22-2, Williams dec. ¶6; Doc. 22-3,

Wilkerson dec. ¶ 6; Doc. 22-4, Hall dec. ¶ 6.  Before completing training, nearly

all CSRs are tested on their knowledge of defendant's timekeeping and pay

policies.  Doc. 22-2, Williams dec. ¶ 4; Doc. 22-3, Wilkerson dec. ¶ 5; Doc. 22-4,

Hall dec. ¶ 5.  CSRs are also required to review the accuracy of their recorded time

worked and as of July 2009, are allowed to electronically make corrections to the

amount of recorded time worked.  Doc. 22-2, Williams dec. ¶7; Doc. 22-3,

Wilkerson dec. ¶ 7; Doc. 22-4, Hall dec. ¶ 7.  Under defendant's open door policy,

employees are instructed to contact various members of management when any

action taken by a coworker or supervisor violates defendant's policies or the law.

Doc. 22-2, Williams dec. ¶ 4; Doc. 22-3, Wilkerson dec. ¶ 4; Doc. 22-4, Hall dec.

¶ 4; Doc. 22-8 (Open Door Policy).  Finally, since November 6, 2008, CSRs who

try logging in to their computers before clocking in see a "Sitel User Access

Statement" which states:

> All associates that use timekeeping system software must
> log in immediately.  Non-exempt associates, such as
> CSRs, must begin their workday by logging into the
> timekeeping system BEFORE opening computer tools or
> applications, reviewing any work-related materials, or
> performing any other work.

Doc. 22-10 (User Access Statement).

Defendant presents powerful evidence _if_ the court was faced with a decision

on the merits or on whether to award liquidated damages and if plaintiff failed to

rebut the evidence.  At this juncture though, defendant misses the mark again by

extolling the virtues of its written policies and timekeeping procedures.

Significantly, plaintiff's allegations and the supporting declarations establish that

defendant has an unwritten "policy to violate the policy" with regard to not paying

CSRs for time worked off the clock pre-shift and post-shift.  _See White v. Baptist_

_Memorial Health Care Corp._, 2011 WL 1883959, at *9 (W.D. Tenn. May 17,

2011) ("Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's 'common or uniform practice was to not follow its formal, written policy.'") (citation omitted). Here, plaintiff has made a sufficient initial showing that all members of the putative class were similarly affected by this "policy to violate the policy" because all state that their supervisors told them, either during training or when they inquired about pay for their pre-shift and post-shift time, that defendant paid the CSRs only for their "Available" time.[10] Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 14. If plaintiff can ultimately prove that CSRs perform work tasks before and after their "Available" time (as plaintiff and dozens of prospective opt-in plaintiffs have alleged they did), and that defendant suffered them to do this pre-shift and post-shift without paying them, then the extent to which defendant's written timekeeping policies preach to the contrary would be irrelevant. *See Longcrier*, 595 F. Supp. 2d at 1238 n.27 ("Whether [defendant] 'required' Plaintiffs to work off the clock is not an element of Plaintiffs' FLSA causes of action; rather, all that is necessary is that Defendant suffered its hourly

---

[10]Moreover, plaintiff has responded to various portions of defendant's written policies, stating that by verifying the accuracy of their recorded time worked, CSRs were only verifying the punch times shown in the system, rather than that they did not also perform pre-shift and post-shift work. Doc. 29-1, plaintiff supp. dec. ¶ 7. Further, plaintiff denies ever seeing the "Sitel User Access Statement" until he read defendant's response brief. Doc. 29-1, plaintiff supp. dec. ¶ 8.

employees to work in that fashion.") (citing *Allen v. Board of Public Educ. for Bibb County*, 95 F.3d 1306, 1314 (11th Cir. 2007)).  Accordingly, insofar as defendant's apparent position is that its written policies bar plaintiff's FLSA claim, this position is contrary to applicable law.

The court is likewise not persuaded that plaintiff has not met his burden of showing a similarly situated class by defendant's submission of the declarations of eight former employees at defendant's Birmingham call center who each state that defendant properly paid them for all time worked, that no one instructed them to work off the clock, and that they never observed any other employee engaging in such practices.  Doc. 22-13, Ontiti dec. ¶¶ 5-8; Doc. 22-14, Lawrence dec. ¶¶ 5, 7-8; Doc. 22-15, Barnes dec. ¶¶ 5-9, 11; Doc. 22-16, Essix dec. ¶¶ 5-6; Doc. 22-17, Morton dec. ¶¶ 5, 7-8; Doc. 22-18, Allen dec. ¶ 5; Doc. 22-19, Rodriquez dec. ¶¶ 5-6.  Again, the court will not ignore plaintiff's allegations and the twenty-eight other declarations that say otherwise.[11]  Although defendant claims that it is not asking the court to rule on the merits of plaintiff's claims, it opposes plaintiff's

---

[11]Moreover, the court notes that defendant's declarations are over two and a half years old.  Each declarant was then employed at defendant's Birmingham call center when defendant obtained their declarations and submitted them in opposition to a motion for conditional certification in a previous lawsuit filed against defendant in this court, *Wallace v. Sitel Corp.*, 2:08-cv-01572-AKK, in which the court granted conditional class certification as to defendant's Birmingham and Winfield locations.  As such, the information contained in these declarations have little relevance to defendant's practices within the past two and a half years.

motion by arguing that it does in fact pay CSRs for all time worked.  Such

arguments are inappropriate here, as this court should not consider on a motion for

conditional certification whether plaintiff or putative class members were, in fact,

deprived of overtime compensation in violation of the FLSA.  *See Longcrier*, 595

F. Supp. 2d at 1241.

In sum, whether plaintiff can survive a motion for decertification or prevail

on the merits are matters that are not before this court at this juncture.  Rather, the

court is tasked here solely with ascertaining whether plaintiff has satisfied his

minimal burden at this notice stage of the proceedings—i.e., whether plaintiff can

show that there are other employees who wish to opt-in and that these individuals

are similarly situated to him.  Plaintiff has made such a showing and has satisfied

his burden.  *See Kerce v. West Telemarketing Corp.*, 575 F. Supp. 2d 1354, 1358

(S.D. Ga. 2008) ("Where a plaintiff has demonstrated a reasonable basis for the

allegations of the complaint by filing declarations and consents from class

members, a collective action is authorized, and notice should be issued.") (citing

*Grayson*, 79 F.3d at 1097).  Therefore, his motion is due to be granted.

        3.    *Evidence as to the Geographical Scope of the Conditional*
               *Class*

As a final matter, the court now turns to defendant's insinuations throughout

its brief that if conditional class certification is appropriate at all, notice should be limited to former CSRs of its now-closed Birmingham call center.  Defendant asserts that plaintiff has not shown that it has an Alabama-wide uniform policy requiring plaintiff and others to perform off the clock work in violation of the FLSA.  It is within this court's power to limit notice to a particular geographical area.  *See White*, 204 F. Supp. 2d at 1318.  While defendant is correct that conditional class certification is inappropriate where a plaintiff's allegations are based on "infrequent detours from established company policies," perhaps due to the actions of an individual supervisor in only one location, *Longcrier*, 595 F. Supp. 2d at 1239-40, nothing in the record indicates that this is the case here.

Indeed, although plaintiff contends that similarly situated CSRs exist in all four Alabama locations, all of the declarations that plaintiff has produced are from former Birmingham CSRs, with the exception of Faith Wilkerson, a CSR currently working at defendant's Andalusia call center.  *See* Doc. 30-1, Wilkerson dec. Importantly, however, Wilkerson's declaration certainly supports plaintiff's position that there are other CSRs in Alabama who feel aggrieved in ways similar to plaintiff and the other Birmingham CSRs.  Moreover, each declarant has testified that he or she believes that others would join this lawsuit if they received notice.  Docs. 14-1 to 14-18, 29-2 to 29-10, and 30-1, ¶ 15.  And, plaintiff's claim

that the mistreatment occurred state-wide is also supported by defendant's own evidence that it used Pay from the Switch to record CSRs' time at all four locations, as well as the lack of any evidence that it handled payroll on a different basis at its four locations.  As such, the record indicates that defendant employed the same policies and processes with respect to CSRs' pay provisions state-wide.

Moreover, the court is not aware of a requirement that a plaintiff must submit a declaration from an employee at each of a defendant employer's locations, before the court can issue notice encompassing that location.  Indeed, other district courts have granted conditional class certification in cases where fewer than all locations of the defendant employer are represented by way of declarations from potential opt-in plaintiffs.  *See Vargas v. Richardson Trident Co.*, 2010 WL 730155, at *10 & n.14 (S.D. Tex. Feb. 22, 2010) (issuing notice to employees working in thirteen locations among several southern states, despite the fact that all of plaintiff's declarations were limited to defendant's Houston, Texas location, save for one from an employee alleging that FLSA violations also occurred at defendant's Katy, Texas location); *Pendlebury v. Starbucks Coffee Co.*, 2005 WL 84500, at *3 (S.D. Fla. Jan. 3, 2005) (conditionally certifying nation-wide class of coffee shop managers on the basis of declarations from two plaintiffs working in Florida and four additional managers who worked in Iowa,

29

Virginia, Florida, and Connecticut).  *See also Sedtal v. Genuine Parts Co.*, 2009

WL 2216593, at *5 (E.D. Tex. July 23, 2009) ("[G]eographic commonality is not

necessary to satisfy the FLSA collective action's 'similarly situated' requirement.

Rather, the focus is on whether the employees were impacted by a common

policy.") (internal citations omitted).

Additionally, while several courts in this circuit have limited notice to a

particular geographic area, they based their decisions on facts distinguishable from

those here.  In *White v. Osmose*, the court restricted notice to Alabama employees

despite plaintiff's request for nationwide notice, in part, because plaintiff only

provided affidavits from employees in Alabama.  204 F. Supp. 2d at 1317 & n.8.

However, plaintiff's only allegation in support of nationwide discrimination was a

complaint about issues that occurred outside the time frame of the proposed

notice.  *Id.*  Another district court in this circuit restricted notice to employees

working at a defendant trucking company's Jacksonville, Florida terminal, despite

plaintiff's claim that employees were similarly situated throughout defendant's

many terminals in various states.  *See Tucker v. Labor Leasing, Inc.*, 872 F. Supp.

941, 948-49 (M.D. Fla. 1994).  Importantly, however, the court found the plaintiff

had not presented any evidence with regard to the job requirements or pay

provisions of employees at other terminals, whereas defendant presented evidence

that it made wage rates and shift decisions on a terminal-by-terminal basis.  *Id.*  In contrast here, plaintiff has presented consistent evidence that CSRs throughout defendant's Alabama locations share the same job duties and are subject to the same methods of recording time worked.  Indeed, there is no evidence on record that payroll decisions are made on a localized basis.  Accordingly, the court concludes that notice to all of defendant's Alabama locations is warranted under these circumstances.

### C.    Plaintiff's Proposed Notice to Prospective Opt-In Plaintiffs

"By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative."  *Hoffman-La Roche*, 493 U.S. at 171-72.  Attached to the Motion for Conditional Class Certification is a proposed five-page notice form to be mailed to all putative class members, styled "Notice of Right to Opt-In to Lawsuit."  Doc. 12-1.  Defendant argues that even if the court granted plaintiff's motion in whole or in part and exercise its discretion to facilitate notice to the proposed class, the proposed notice drafted by plaintiff is deficient and inappropriate.  As such, defendant asks for the opportunity to (i) meet and confer with plaintiff's counsel to address deficiencies in the proposed notice, and (ii) propose an alternative notice, and (iii) if necessary, separately argue the propriety of any unresolved issues involving notice.  Plaintiff does not

object to this proposal, but maintains that his notice form is sufficient.

Accordingly, plaintiff's counsel and defendant's counsel shall confer regarding the form of the notice in an attempt to reach an agreement.  The parties are ordered, within thirty (30) days from the date of the entry of this order, to submit a mutually agreeable form of notice of opt-in rights for the court's approval.  To the extent that the parties are unable to agree, they must file separate proposals on or before that deadline, explaining the specific differences in their proposals and providing justification for same.

## V.  CONCLUSION

For the reasons stated above, the court **GRANTS** plaintiff's motion for conditional class certification and notice.  To facilitate the provision of notice, defendant is ordered, within forty-five (45) days from the date of this order, to provide to plaintiff's counsel in a mutually agreeable format a list containing the names and current or last known addresses of all current and former nonexempt CSRs whom defendant employed at any time between March 3, 2008 and the filing of the complaint on March 3, 2011, at its four Alabama locations.[12]

---

[12]Because plaintiff has alleged a willful violation of the FLSA, the notice period for the conditional opt-in class is three years back from the filing of the complaint.  *See* 29 U.S.C. § 255(a); *see also Knight v. Columbus, Ga.*, 19 F.3d 579, 581 (11th Cir. 1994), *cert. denied*, 513 U.S. 929 (1994) ("Actions under the FLSA are 'forever barred' unless 'commenced within two years after the cause of action accrued.'  In the case of willful violations, the limitations period is

**DONE** this the 26th day of August, 2011.

ABDUL K. KALLON

UNITED STATES DISTRICT JUDGE

---

extended to three years.") (citation omitted).  Obviously, plaintiff has the burden at trial to show a willful violation and thereby trigger the three-year limitations period.  *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008).